UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NICOLE NICHOLS and ROBERT NICHOLS, <br><br> Plaintiffs, <br><br> vs. <br><br> MMIC INSURANCE INC., MICHAEL P. WOODS, M.D., and BELLEVUE OBSTETRICS & GYNECOLOGY ASSOCIATES, P.C., <br><br> Defendants. | 4:14-CV-04025-KES <br><br><br> ORDER GRANTING DEFENDANTS WOODS AND BELLEVUE'S MOTION TO DISMISS AND GRANTING IN PART AND DENYING IN PART DEFENDANT MMIC'S MOTION TO DISMISS |

Plaintiffs, Nicole and Robert Nichols, bring claims against defendant Dr. Michael P. Woods and Bellevue Obstetrics & Gynecology Associates, P.C., (Bellevue) alleging medical malpractice, negligent infliction of emotional distress, and loss of consortium. Additionally, plaintiffs bring claims against defendant MMIC Insurance, Inc., (MMIC) alleging intentional interference with a business relationship and intentional infliction of emotional distress, as well as seeking punitive damages. Woods and Bellevue move to dismiss for lack of personal jurisdiction or, alternatively for dismissal or transfer of the case due to improper venue. MMIC moves to dismiss for lack of subject matter jurisdiction or, alternatively, to dismiss for failure to state a claim.[1] For the

---

[1] Woods and Bellevue, along with MMIC, also requested oral argument pursuant to D.S.D. Civ. LR 7.1. Docket 23 at 1; Docket 26 at 1. Because the

following reasons, Woods and Bellevue's motion to dismiss is granted, and MMIC's motion is granted in part and denied in part.

## BACKGROUND

The facts, according to the amended complaint (Docket 17),[2] are as follows:

Plaintiffs are residents of South Dakota. Defendant MMIC is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Defendant Woods is a licensed medical physician who currently resides in Iowa. During the events giving rise to this dispute, however, Woods was a resident of and licensed physician in the state of Nebraska, with medical malpractice insurance provided by MMIC. Additionally, during this time, Woods was employed by defendant Bellevue, a Nebraska corporation.

---

court can resolve the pending motions to dismiss without oral argument, the parties' requests are denied.

[2] Plaintiffs filed their original complaint on February 14, 2014. Docket 1. On March 18, Woods and MMIC each moved to dismiss the original complaint. Docket 10, 13. On April 8, plaintiffs filed memoranda in opposition to defendants' motions to dismiss. Docket 21, 22. One day earlier, however, plaintiffs filed their amended complaint, Docket 17, and defendants subsequently moved to dismiss the amended complaint. Docket 23, 26. Because "[i]t is well-established that an amended complaint [supersedes] an original complaint and renders the original complaint without legal effect[,]" this court will only address the allegations set out in the amended complaint. *See In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000). Similarly, defendants' motions to dismiss the original complaint were also rendered null by the filing of plaintiffs' amended complaint. *Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 956 (8th Cir. 2002) (citation omitted).

On approximately March 16, 2012, Woods performed a cystourethroscopy[3] on Nicole Nichols in Bellevue, Nebraska. Following this procedure, Woods diagnosed Nicole with interstitial cystitis.[4] Subsequently, Woods obtained Nicole's consent to perform a series of bladder instillations[5] as part of Woods' recommended treatment regime. On June 15, 2012, Woods recommended and performed a hysterectomy in order to resolve Nicole's condition. After the procedure, however, Woods informed Nicole that additional bladder instillations would still be required. Following the treatment and procedures Woods performed, Nicole began to suffer from bladder irritation, infection, incontinence, loss of sensation, and vaginal pain.

Sometime after the hysterectomy procedure, Nicole discontinued receiving care from Woods. In August 2012, Nicole began a physician-patient relationship with Dr. Andrew E. Bourne, a urologist at Siouxland Urology Associates, P.C., in Dakota Dunes, South Dakota. On September 11, 2012, Bourne performed a cystouresthroscopy on Nicole, which revealed no evidence of a condition that would support a diagnosis of interstitial cystitis. Further,

---

[3] A cystourethroscope is "[a]n instrument combining the uses of a cystoscope and a urethroscope, allowing visual inspection of both the bladder and urethra." *Stedman's Medical Dictionary* 486( 28th ed. 2006)

[4] Interstitial cystitis is defined as "a chronic inflammatory condition of unknown etiology involving the epithelium and muscularis of the bladder, resulting in reduced bladder capacity, pain relieved by voiding, and severe bladder irritative symptoms." *Stedman's Medical Dictionary* 484-85 (28th ed. 2006).

[5] An instillation involves "[d]ropping of a liquid on or into a body part." *Stedman's Medical Dictionary* 983 (28th ed. 2006).

3

Bourne informed Nicole of his belief that Woods' diagnosis and treatment amounted to professional negligence.

Plaintiffs subsequently informed Bourne of their intention to bring legal action against Woods and asked if Bourne would be willing to testify as an expert witness on their behalf. Bourne agreed and, on August 23, 2013, plaintiffs engaged counsel for the purpose of initiating a malpractice action against Woods. Bourne continued to treat Nicole during this time and, up until January 29, 2014, discussed aspects of plaintiffs' claims against Woods with plaintiffs and their counsel.

On September 25, 2013, Woods received notice of plaintiffs' malpractice suit. On November 1, 2013, MMIC advised plaintiffs' counsel that it provided malpractice insurance to Woods and requested medical authorization to investigate plaintiffs' claims. On November 19, 2013, plaintiffs provided MMIC with signed authorization to obtain Nicole's medical records.

MMIC also provided malpractice insurance to Bourne and became aware that he was Nicole's treating urologist. On January 29, 2014, Bourne informed plaintiffs that he could no longer discuss plaintiffs' case without MMIC's approval. On January 30, 2014, Bourne further advised plaintiffs that MMIC would not allow him to act as an expert witness on their behalf. Consequently, Bourne would not be able to provide his opinion regarding the appropriate standard of care applicable to plaintiffs' malpractice suit against Woods.

4

I.   **Does This Court Have Personal Jurisdiction Over Woods and Bellevue?**

The party asserting personal jurisdiction bears the burden of establishing a prima facie case, and the burden does not shift to the party challenging jurisdiction. *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003) (internal citations omitted). A plaintiff's prima facie showing may be tested by reference to the pleadings, affidavits, exhibits, or other evidence. *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (citing *Block Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 260 (8th Cir. 1974)). Nonetheless, "[w]hile the plaintiffs bear the ultimate burden of proof, jurisdiction need not be proved by a preponderance of the evidence[.]" *Epps*, 327 F.3d at 647 (citing *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991)).

In a diversity action, the court " 'may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause.' " *Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004) (quoting *Dever*, 380 F.3d at 1073). In South Dakota, the reach of the state's long-arm statute is coextensive with the Due Process Clause. *See* SDCL 15-7-2(14); *see also Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 225 (8th Cir. 1987). Thus, for this court to exert personal jurisdiction over Woods and Bellevue depends on " 'whether the exercise of jurisdiction comports with the limits imposed by federal due

process' on the State of [South Dakota]." *See Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014)).

"Due process mandates that jurisdiction be exercised only if [the] defendant has sufficient 'minimum contacts' with the forum state, such that summoning the defendant to the forum state would not offend 'traditional notions of fair play and substantial justice.' " *Digi-Tel Holdings, Inc. v. Proteq Telecomms., Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Additionally, analyzing the "minimum contacts" requirement depends on whether the court's jurisdiction over a party is said to be specific or general. *See Helicopteroes Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). A forum may exercise specific jurisdiction when the cause of action is "arising out of or related to the defendant's contacts with the forum[.]" *Id.* at 414. By contrast, general jurisdiction may be asserted when a defendant's contacts with the forum are said to be "continuous and systematic," irrespective of whether the cause of action relates to the defendant's activities in the forum. *Id.* "Both theories of personal jurisdiction require 'some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Dever*, 380 F.3d at 1073 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

Here, plaintiffs contend this court may properly exercise specific jurisdiction over Woods and, by extension, Bellevue. Docket 29 at 4. The court's inquiry, therefore, requires an analysis of " 'the defendant, the forum,

6

and the litigation.' " *Walden*, 134 S. Ct. at 1121 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). "[T]he defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* Additionally, the Eighth Circuit has established a five-factor approach to determine if the "substantial connection" test is met. *See, e.g., Johnson v. Woodcock*, 444 F.3d 953, 956 (8th Cir. 2006); *Porter v. Berall*, 293 F.3d 1073, 1076 (8th Cir. 2002). These factors are: (1) the nature and quality of a defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties. *Johnson*, 444 F.3d at 956. While the first three factors receive significant weight, "[t]he last two factors are considered less important and are not determinative." *Dever*, 380 F.3d at 1074.

The parties do not dispute that, during the time relevant here, Woods was a licensed medical provider in the state of Nebraska. Woods further asserts, and plaintiffs do not contradict, that Woods has not provided any medical care in South Dakota, nor has he held a license to practice medicine in South Dakota. *See* Docket 28 at ¶ 6 (Woods Affidavit). Moreover, no challenge is made to Woods' statement that he has not advertised his services in South Dakota. *Id.* at ¶ 5. Further, there is no dispute that the interstitial cystitis diagnosis, bladder instillations, and hysterectomy procedure were made or performed outside of South Dakota. Additionally, plaintiffs acknowledge Bellevue is a Nebraska corporation, Docket 17 at ¶ 7, and no argument is

presented that Bellevue conducts or is licensed to conduct business in South Dakota. *Cf.* Docket 27 at 6 (contending Bellevue "does not own or operate clinics in South Dakota" and that Bellevue "is not even registered to conduct business in South Dakota.").

Plaintiffs maintain, however, that this court may properly exert personal jurisdiction over Woods due to several specific contacts with the forum which give rise to plaintiffs' claims. For instance, plaintiffs assert that Woods made numerous telephone calls to plaintiffs' home in Dakota Dunes, South Dakota, in order to convey medical advice related to different phases of Nicole's treatment. Docket 29 at 5; *see also* Docket 18 ¶¶ 14, 20-22 (Nicole Affidavit) (noting Woods' phone calls directed Nicole to continue taking medication and to schedule additional treatment in Nebraska). Additionally, plaintiffs contend Woods made several phone calls to a Dakota Dunes pharmacy for the purpose of filling Nicole's medication prescription. Docket 29 at 5. Moreover, plaintiffs argue that Woods requested Nicole to come to Nebraska for additional treatment, despite her desire to find treatment closer to home. *Id.* Plaintiffs conclude that Woods therefore should have anticipated being haled into federal court in South Dakota. *Id.* at 6.

In support of their argument, plaintiffs direct this court to follow a district court decision from the Tenth Circuit, *Ray v. Heilman*, 660 F. Supp. 122 (D. Kan. 1987). Docket 29 at 6. The *Ray* case involved a medical malpractice suit brought by the conservator of the estate of the defendant's former patient. There, the defendant argued personal jurisdiction could not be

8

exerted over him by the Kansas federal court. *Ray*, 660 F. Supp. at 123. The defendant emphasized he was licensed only to practice medicine in Missouri, that the acts giving rise to the suit occurred in Missouri, that he had never practiced medicine in Kansas, and that he had never treated the decedent in Kansas. *Id.* Plaintiff countered that the defendant phoned in prescription refills to a pharmacy in Kansas, that the decedent took the medication in Kansas, that the defendant arranged monthly medical tests to be performed in Kansas, and that the results of those tests were sent to the defendant in Missouri. *Id.* Additionally, following the decedent's development of a leg hemorrhage, the defendant provided several instructions and orders to the decedent and his wife via telephone over the course of eight days. *Id.* While the majority of the Kansas federal court's legal analysis involved application of the Kansas long-arm statute, the court concluded that the "minimum contacts" requirement of due process was met. *Id.* at 124.

The specific factual circumstances of the *Ray* decision are similar to those present here, but Woods does not directly address it. Woods instead relies on the Eighth Circuit opinion in *Porter v. Berall*, 293 F.3d 1073, 1076 (8th Cir. 2002) for the proposition that an interstate exchange of letters, telephone calls, and email communications are insufficient to establish personal jurisdiction. The *Porter* case involved a legal malpractice suit brought in Missouri against a Connecticut partnership. There, the parties exchanged numerous communications between Connecticut and Missouri via telephone calls and letters related to the defendant's legal services. *Porter*, 293 F.3d at

1075. The plaintiffs argued that the Missouri federal court had jurisdiction over the defendant because "the injury from this negligence was felt in Missouri." *Id.* Applying its five-factor analysis, however, the Eighth Circuit concluded the plaintiffs had not sufficiently satisfied the first two factors. *Id.* at 1076. As the court observed, "[c]ontact by phone or mail is insufficient to justify exercise of personal jurisdiction under the due process clause." *Id.* The court also noted the defendant was not licensed in Missouri, did not have an office in Missouri, and did not solicit business in Missouri. *Id.* at 1077. Rather, the defendant provided legal advice concerning Connecticut law from its office in Connecticut. *Id.*

The Eighth Circuit reached a similar conclusion in its earlier decision of *Austad Co. v. Pennie & Edmonds*, 823 F.2d 223 (8th Cir. 1987). The *Austad* case involved a legal malpractice suit brought by a South Dakota corporation against a New York partnership. The plaintiff asserted that numerous phone calls between South Dakota and New York, the use of a courier service, monthly bills sent to South Dakota, and checks paid from a South Dakota bank warranted an exercise of personal jurisdiction over the defendant. *Austad*, 823 F.2d at 226. Additionally, the defendant had sent a law clerk to the plaintiff's South Dakota facilities to gather information and to review documents over the course of three days. *Id.* Nonetheless, applying the five-factor test, the Eighth Circuit concluded that the defendant did not "purposefully avail[] itself of the benefits and protections of the laws of South Dakota." *Id.* at 227. As the court explained, the defendant had its principal

10

place of business in New York, was not licensed to practice in South Dakota, had no bank accounts or business interests in South Dakota, never advertised in South Dakota, and never solicited any clients from South Dakota. *Id.* at 224. Additionally, the acts giving rise to the lawsuit involved patent litigation taking place in Maryland rather than South Dakota. *Id.* at 226. Thus, the "minimum contacts" requirement was not satisfied. *Id.* at 227.

Woods also relies upon the Ninth Circuit's decision in *Wright v. Yackley*, 459 F.2d 287 (9th Cir. 1972) for the premise that interstate communications made to a pharmacy located within the forum for prescription refills is not sufficient to establish personal jurisdiction. Docket 27 at 6. The *Wright* decision involved a medical malpractice action brought by an Idaho resident against a South Dakota doctor. There, the plaintiff was originally a resident of South Dakota and, after receiving treatment from the defendant, moved to Idaho. *Wright*, 459 F.2d at 288. While in Idaho, the plaintiff wished to have her medication prescription refilled at an Idaho drugstore. *Id.* The defendant sent the Idaho drugstore copies of the plaintiff's prescription, and the drugstore issued refills. *Id.* Subsequently, the plaintiff allegedly suffered an injury as a result of taking the medication. *Id.* The Ninth Circuit observed, however, that if any medical malpractice occurred, it was attributable to the original diagnosis and prescription which took place in South Dakota. *Id.* By sending copies of the original prescription to Idaho, the South Dakota doctor was merely continuing the original treatment regime rather than beginning a new one. *Id.* at 289. While much of the court's opinion considered the applicability of the

Idaho long-arm statute, the Ninth Circuit observed that the case before it did not involve "voluntary, interstate economic activity . . . directed at various states in order to benefit from effects sought in those states." *Id.* at 290. Rather, "here the residence of a recipient in the forum state is irrelevant and incidental[,]" and "the defendant is not one who 'purposefully avails itself of the privilege of conducting activities within the forum State.' " *Id.* (quoting *Hanson*, 357 U.S. at 253). Ultimately, the trial court could not exercise personal jurisdiction over the defendant.

Assessing the Eighth Circuit's five-factor test, the first two factors are closely intertwined. With respect to the first factor, which looks to the nature and quality of Woods' contacts with the forum, plaintiffs rely on the various telephone calls placed to South Dakota from Woods' office in Nebraska. As the Eighth Circuit has held, "[c]ontact by phone or mail is insufficient to justify exercise of personal jurisdiction under the due process clause." *Porter*, 293 F.3d at 1076. Moreover, while those calls were placed to locations within South Dakota, the nature of those calls all related to the treatment Nicole received at Bellevue. For example, the earliest event concerning Woods in Nicole's affidavit involved an ultrasound performed by a physician's assistant at Bellevue. Docket 18 at ¶ 4. Some time after the ultrasound, Dr. Keith Vollstedt, a Dakota Dunes physician, performed a hiatal hernia repair for Nicole at the Siouxland Surgery Center in Dakota Dunes, South Dakota. *Id.* at ¶ 5. While no link between the two locations is provided, the Bellevue physician's assistant called Nicole in the interim and told her that Woods reviewed the ultrasound and

12

made a finding which he recommended Dr. Vollstedt address. *Id.* at ¶ 6. Nicole relayed this information to Dr. Vollstedt, who determined the finding was "of no consequence" to the procedure he performed. *Id.*

Later, after Woods made the interstitial cystitis diagnosis at Bellevue, Woods' office directed "many phone calls [to Nicole's] home" to schedule instillations for the treatment of her condition. *Id.* at ¶ 14. On several occasions, Nicole asked a nurse over the phone if she could have the instillations done closer to home. *Id.* at ¶ 15. Woods, speaking through the nurse, is said to have insisted that Nicole return to Nebraska or Iowa for treatment. *Id.* at ¶16. When Nicole described discomfort or pain over the telephone to the nurse, she was directed to take her medication and to continue coming to Nebraska for instillations. *Id.* at 19-20. Following the hysterectomy procedure, Woods had his office telephone Nicole at home in order to schedule additional instillations in Nebraska. *Id.* at ¶ 21. After Nicole informed the nurse over the phone that she was suffering from infections, Nicole was directed to take her pain medication and return to Nebraska for more instillations. *Id.* at ¶ 22. Regarding Nicole's medication, Woods is said to have routinely prescribed Nicole medicine and called in those prescriptions to a pharmacy in Dakota Dunes, South Dakota. *Id.* at ¶¶ 23, 24. Thus, the nature and quality of Woods' contacts with the forum appears to be limited to phone calls to plaintiffs' South Dakota residence and pharmacy as part of the treatment Woods performed in Nebraska.

13

With respect to the second factor, plaintiffs argue that the contacts in the present case are more numerous than the "infrequent or isolated" contacts in the *Porter* and *Yackley* cases. Docket 29 at 7. The quantity of Woods' phone calls is described as being "many" in total, Docket 18 at ¶ 14, or "numerous." Docket 29 at 5. In *Porter*, the district court opinion noted that the relationship between the parties existed for several years. *See Porter v. Berall*, 142 F. Supp. 2d 1145, 1147 (W.D. Mo. 2001) (describing plaintiffs as clients of the defendant as early as 1996 with the principal malpractice claim occurring in 1998). The Eighth Circuit opinion described "numerous" calls and letters sent between the parties over this period of time. *Porter*, 293 F.3d at 1076. Likewise, the *Austad* court described "numerous" phone calls between the parties during the course of their relationship. *Austad,* 823 F.2d at 226. The *Yackley* decision appears to involve a single transaction. 459 F.2d at 288. Although descriptions like "numerous" and "many" do not invite a precise comparison, it does not appear that the contacts asserted here are any more numerous than those in the *Porter* and *Austad* cases.

Additionally, while plaintiffs assert they are relying on "other contacts" beyond those attributable to the phone calls placed to Nicole and the Dakota Dunes pharmacy, no description of what those other contacts may be is provided. By comparison, the *Austad* court described several other contacts beyond the "numerous phone calls between New York and South Dakota[.]" *See Austad*, 823 F.2d at 226. The court accounted for the physical presence of the defendant's law clerk in South Dakota over the course of three days to review

14

and inspect documents, the parties' use of a courier service paid by the plaintiff, monthly bills sent to South Dakota, and checks drawn on a South Dakota bank. *Austad*, 823 F.2d at 226. Despite those additional contacts, the Eighth Circuit concluded the defendant nonetheless did not have sufficient contacts with South Dakota. *Id.* at 227. The contacts described by plaintiffs appear to be fewer in quantity than those found insufficient to establish personal jurisdiction in *Austad*.

Thus, while the facts in this case are similar to the *Ray* decision cited by plaintiffs, this court is not bound to follow it. Moreover, the majority of the *Ray* court's discussion involves the Kansas long-arm statute, and it does not rely on the same multi-factor approach as articulated by the Eighth Circuit. *See Ray*, 660 F. Supp. at 124. In contrast, this case is analogous to *Porter*, in which the Eighth Circuit concluded that "the plaintiffs have not satisfied the first two factors notwithstanding the numerous phone calls and letters that were exchanged between the parties." *Porter*, 293 F.3d at 1076. Further, in both *Porter* and *Austad*, the Eighth Circuit considered not only the defendants' alleged contacts with the forum, but also noted their lack of contacts with the forum. Like the defendant in *Porter*, Woods is not licensed to practice in South Dakota nor does he or Bellevue maintain an office in South Dakota. Additionally, as in *Austad*, Woods does not reside in South Dakota or advertise his business in South Dakota. As the *Wright* court noted, if any malpractice occurred in this case, "it was through acts of diagnosis and prescription performed in" Nebraska. *Wright*, 459 F.2d at 288. Rather than a "diagnosis and

15

treatment by [phone,]" *Id.* at 289, the telephone calls were "simply reflective of, and indeed a part of the earlier treatment and prescription" performed outside the forum. *Id.* n.4. Furthermore, as the *Austad* court explained, the acts that gave rise to the present lawsuit took place in Nebraska rather than South Dakota.

Perhaps most critical to the present case, however, is the third factor, which measures the relation of the cause of action to the defendant's contacts with the forum. The Supreme Court has explained that specific jurisdiction focuses on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977). The Court has recently elaborated that "[this] relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 134 S. Ct. 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (emphasis in original). Additionally, the Court explained, the due process "minimum contacts" analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.*

Here, plaintiffs plead three causes of action against Woods involving medical malpractice, negligent infliction of emotional distress, and loss of consortium. The negligent infliction of emotional distress claim, however, stems from the acts and omissions alleged in the medical malpractice claim. *See* Docket 17 at 8 ("As a direct and proximate cause of Woods' conduct, failure and omissions, arising out of his treatment of Nicole . . . "). Similarly, the loss of consortium claim derives from the malpractice claim. *See id.* ("That all the

16

aforesaid injuries and damages were caused solely and proximately by the negligence of Woods."). With respect to the malpractice claim itself, however, Woods has not provided any medical care or services in South Dakota. Rather, the conduct that forms the basis for the malpractice claim–for example, the interstitial cystitis diagnosis, the bladder instillations, and the hysterectomy procedure–all took place outside of South Dakota. The only contacts with South Dakota that Woods is alleged to have created involve the phone calls placed to Nicole and her pharmacy. As defendants argue, however, plaintiffs' claims are not based on the phone calls placed into South Dakota, but on the acts and omissions alleged to have taken place in Nebraska. Docket 33 at 6-7.

Consequently, the relationship between plaintiffs' causes of action and the contacts Woods is alleged to have made with South Dakota is tenuous. Although Woods' alleged acts and omissions may have had collateral effects inside South Dakota, that does not resolve the issue in plaintiffs' favor. *Cf. Walden*, 134 S. Ct. at 1125 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."). At the same time, rather than focusing on Woods' contacts with the state of South Dakota, plaintiffs' use of the phone calls placed to Nicole and her pharmacy appears to focus on "the defendant's contacts with persons who reside [in South Dakota]." *Id.* at 1122. In fact, plaintiffs state in their brief that "Nicole Nichol's cause of action arises from defendants' specific and purposefully directed *contacts with Nicole*, a South Dakota resident[.]" Docket 29 at 7 (emphasis added).

17

Plaintiffs attempt to reconcile these deficiencies by citing to the Supreme Court's decision in *Burger King* that "[j]urisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State." Docket 29 at 7 (quoting *Burger King*, 471 U.S. at 476).[6] Additionally, plaintiffs draw support from the Court's observation two sentences later in *Burger King* that

> So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Id. Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) is cited by the Court as the primary source of its conclusion. Earlier in the *Burger King* opinion, the Court similarly characterized *Keeton* as standing for the proposition that "specific jurisdiction . . . is satisfied if the defendant has 'purposely directed' his activities at residents of the forum[.]" *Burger King*, 471 U.S. at 472 (quoting *Keeton*, 465 U.S. at 774).[7] But in *Keeton*, the defendant "purposely directed" a circulation of magazines inside the forum state which generated "regular

---

[6] Plaintiffs' quotation of this portion of the *Burger King* opinion reads: "Jurisdiction cannot be avoided merely because the defendant did not physically enter the forum state." Docket 29 at 7. Plaintiffs' quoted language is not actually contained within the *Burger King* opinion itself, however, but appears to be a quotation of West Headnote #14. Notably, plaintiffs' version leaves off the Court's qualification that its conclusion applied "in the[] circumstances" described by the Court. *See Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985).

[7] The Court also described specific jurisdiction's requirement that the "litigation results from alleged injuries that " 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472-73 (quoting *Helicopteros*, 466 U.S. at 414). In *Keeton*, the cause of action was based on libelous material published in the magazines circulated by the defendant. *Keeton*, 465 U.S. at 772.

18

monthly sales of thousands of magazines[.]" *Keeton*, 465 U.S. at 773-74. As the *Walden* Court observed, it was the defendant's act of "circulating magazines to 'deliberately exploi[t]' a market in the forum State" which provided its necessary contacts with the forum state itself. 134 S. Ct. at 1122 (quoting *Keeton*, 465 U.S. at 481) (alteration in original). By contrast, however, "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 134 S. Ct. at 1122.

Examining the evidence here, neither Woods nor Bellevue conducts, or is licensed to conduct, business in South Dakota. Likewise, Woods has not advertised his services in South Dakota. Consequently, under these circumstances, it cannot be said that Woods "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" simply by contacting Nicole or her local pharmacy by phone as part of the treatment she received in Nebraska. *See Hanson*, 357 U.S. at 253. "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Id.* Here, the only link between Woods and South Dakota is the fact that Nicole made a unilateral decision to reside in South Dakota after receiving medical treatment in Nebraska, rather than any contacts Woods or Bellevue have made with the forum themselves.

Therefore, plaintiffs have not satisfied their burden of making a prima facie showing that this court has personal jurisdiction over Woods or Bellevue. The first three factors of the Eighth Circuit's five-factor test weigh against

establishing a substantial connection between the forum and the defendant. Analysis of the remaining two factors would not change this result. *See Dever*, 380 F.3d at 1074. Therefore, Woods and Bellevue's motion to dismiss for lack of personal jurisdiction is granted. Consequently, the court need not address the parties' remaining arguments with respect to venue.

## II.     Should Plaintiffs' Claims Against MMIC Be Dismissed?

### A.     Legal Standard

MMIC's motion to dismiss is brought pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. A party challenging subject matter jurisdiction under Rule 12(b)(1) must attack either the facial or factual basis for jurisdiction. *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). A facial challenge requires the court to examine the complaint and determine if the plaintiff has sufficiently alleged a basis for subject matter jurisdiction, and the nonmoving party receives the same protections as it would if defending a motion to dismiss under Rule 12(b)(6). *Id.* A factual attack challenges the factual basis for subject matter jurisdiction, and the court considers matters outside the pleadings without giving the nonmoving party the benefit of the Rule 12(b)(6) safeguards. *Id.* The party seeking to establish jurisdiction has the burden to prove that jurisdiction exists. *Id.* at 730 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

When reviewing a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all

reasonable inferences in favor of the nonmoving party. *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 438 (8th Cir. 2013) (quoting *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court determines plausibility by considering only the materials in the pleadings and exhibits attached to the complaint, drawing on experience and common sense and viewing the plaintiff's claim as a whole. *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003)).

## B.    Discussion.

### 1.    Subject Matter Jurisdiction

MMIC appears to make a factual challenge to this court's subject matter jurisdiction over certain of plaintiffs' claims. *See* Docket 24 at 16 (arguing " '. . . and no presumptive truthfulness must attach to the facts alleged in the complaint.' ") (quoting *Brooks v. Gant*, No. Civ-12-5003-KES, 2013 WL 4017036, at *3 (D.S.D. Aug. 6, 2013)). Thus, the court need not limit its inquiry of this issue to the contents of plaintiffs' amended complaint. Additionally, MMIC's Rule 12(b)(1) argument is intertwined with its arguments

for dismissal pursuant to Rule 12(b)(6). As part of plaintiffs' tortious interference claim, plaintiffs assert a claim for damages as a result of having their case against Woods diminished. Docket 17 at ¶ 51. MMIC argues that plaintiffs have failed to adequately plead any claims upon which relief can be granted. *See, e.g.*, Docket 24 at 6. MMIC also asserts, however, that subject matter jurisdiction is lacking over plaintiffs' requested recovery based on the alleged diminishment of their case against Woods because that issue is not ripe for review. *See id.* at 8 ("This appears to mean that Plaintiffs expect that their recovery in the malpractice claims will be less than it would otherwise be because Bourne might not testify on their behalf. To the extent that Plaintiffs seek to assert a claim for damages on this issue, their claim is not yet ripe.").

### 2.   Ripeness

Because federal courts are courts of limited jurisdiction, they only have the ability to hear cases that are authorized by Article III of the Constitution or under the statutes that are duly enacted by Congress. *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 982-83 (8th Cir. 2009) (citations omitted). Under Article III there must be a case or controversy at every stage of the litigation, which requires " 'a definite and concrete controversy involving adverse legal interests[.]' " *Id.* at 983 (quoting *McFarlin v. Newport Spec. Sch. Dist.*, 980 F.2d 1208, 1210 (8th Cir. 1992)). " 'Federal courts must always satisfy themselves that this requirement has been met before reaching the merits of a case.' " *Id.* (quoting *Schanou v. Lancaster Cnty. Sch. Dist. No. 160*, 62 F.3d 1040, 1042 (8th

Cir. 1995)). This requirement, also known as a matter's justiciability, is typically tested by three doctrines: ripeness, mootness, and standing. *Id.*

Ripeness is an issue of subject matter jurisdiction. *Dakota, Minn. & E. R.R. Corp. v. South Dakota*, 362 F.3d 512, 520 (8th Cir. 2004) (citation omitted). The Eighth Circuit has stated the basic rationale behind the ripeness doctrine " 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' " *Pub. Water Supply Dist. No. 10 v. City of Peculiar, Mo.*, 345 F.3d 570, 572-73 (8th Cir. 2003) (quoting *Abbott Labs v. Gardner*, 367 U.S. 136, 148 (1967)). Courts also must ask if "a dispute has yet matured to a point that warrants decision[,]" because "[t]he central concern is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3532 at 365 (3d. ed. 2008) (hereafter Wright & Miller). Thus, the ripeness test involves an analysis of both " 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " *Pub. Water Supply*, 345 F.3d at 572-73. The party seeking to invoke jurisdiction must satisfy each prong to a minimal degree. *Id.* (citation omitted).

With respect to fitness, that determination analyzes the court's ability to visit a specific issue. *Id.* at 573. "The fitness prong 'safeguards against judicial review of hypothetical or speculative disagreements.' " *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (quoting *Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000)). Typically,

whether a case is fit for review "depends on whether it would benefit from further factual development." *Pub. Water Supply*, 345 F.3d at 573 (citations omitted). "The case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities." *Id.* (citation omitted).

Regarding the hardship prong, an "[a]bstract injury is not enough. It must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury[.]" *Id.* at 573 (quotations and citations omitted). This factor assesses the potential harm suffered, either financial or due to uncertainty-induced behavior in the absence of adjudication. *Id.* Plaintiffs do not have to wait until the injury occurs, but the injury should be certainly impending. *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 867 (8th Cir. 2013). The court considers both the size of the alleged harm and its immediacy when determining hardship. *Id.*

Neither party explicitly addresses either the fitness or hardship prongs, although it appears their arguments primarily concern the fitness prong. MMIC contends that there are a multitude of uncertain, future possibilities which render plaintiffs' diminishment claim unripe. *See* Docket 24 at 8. For example, it is currently unknowable whether a jury would have found Bourne's testimony credible, and plaintiffs may yet procure an expert whose testimony could be even more favorable to their case. *Id.* at 8-9. Likewise, the outcome of their dispute with Woods, whether it proceeds to trial or is resolved by other means, cannot be predicted. Docket 31 at 4. Therefore, MMIC contends that

24

plaintiffs' claim is not ripe, at least while plaintiffs are still pursuing their case against Woods. Docket 23 at 9.

In response, plaintiffs assert there is no uncertainty or anticipation to the fact that their case against Woods has been diminished. Docket 30 at 8. Plaintiffs' primary authority for their argument is an affidavit signed by a Sioux Falls attorney whose opinion states that "Dr. Bourne's inability or unwillingness to now testify is damaging to Plaintiffs' case both from a settlement standpoint and at trial." *Id.* (citing Docket 19 at 4).[8] The affiant states that medical malpractice cases have "greater legitimacy and chance of success when the plaintiff's treating physician agrees to provide standard of care testimony on behalf of his or her patient." Docket 19 at 2. Further, the treating physician's opinion is significant to an attorney's decision to take a plaintiff's case, and it "enhances pre-suit and pre-trial settlement offers as opposed to retention of an expert witness and those offers are typically higher than in a case where the expert witness is retained." *Id.* at 2-3.

Based on these contentions, and assuming plaintiffs' claim would otherwise be legally cognizable,[9] the fitness prong weighs in favor of MMIC's position. At this point, it is unknowable beyond conjecture what effect the lack of Bourne as an expert will have on the ultimate disposition of plaintiffs' case

---

[8] Nicole's affidavit similarly describes her belief "that [her] case against Dr. Woods has been diminished by MMIC's interference in that a hired expert witness will not carry the same weight as [her] treating physician[.]" Docket 18 at ¶ 49.

[9] Plaintiffs cite no legal authority from any federal or state court recognizing a tort recovery for the alleged diminishment of a party's case.

against Woods, or if their case has in fact been diminished in some way. For example, plaintiffs' claims against Woods and Bellevue have been dismissed for lack of personal jurisdiction. Plaintiffs may decide not to commence action in a court that has jurisdiction over their claims. Even if they do file suit in the proper jurisdiction, they could win or lose at trial with or without Bourne's testimony as an expert. Assuming the case was not resolved before trial, Bourne could fail to persuade the members of the jury that Woods committed malpractice. Likewise, plaintiffs may procure an expert with more courtroom experience whose testimony the jury would find more credible than Bourne's. The observations and opinions stated in plaintiffs' affidavit suffer similarly from the deficiency of attempting to predict "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." Wright & Miller, § 3532; *see also Parrish*, 761 F.3d at 875-76. In sum, plaintiffs' claim for these particular damages "would benefit from further factual development" and is too heavily "contingent on future possibilities" to demonstrate its resolution is fit for review at this time. *See Public Water Supply*, 345 F.3d at 573. With respect to the hardship prong, no argument is presented that withholding judicial review would " 'inflict[] serious practical harm' on the plaintiffs." *Parrish*, 761 F.3d at 875 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733 (1998)). Presumably, plaintiffs would prefer to have the issue adjudicated now, but the general desire to obtain speedy resolution of a dispute is not unique to plaintiffs' position. Consequently, plaintiffs have failed to demonstrate hardship.

As the Eighth Circuit has explained, " '[t]he touchstone of a ripeness inquiry is whether the harm asserted has 'matured enough to warrant judicial intervention.' " *Id.* (quoting *Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 958 (8th Cir. 2001)). The burden is on the plaintiffs to establish this court's subject matter jurisdiction over their request for relief, and plaintiffs shoulder the burden to meet each of the two ripeness requirements. The uncertainties attendant with plaintiffs' claim for damages to a case that has not been resolved strongly suggests the issue is not fit for review. Additionally, plaintiffs' silence with respect to the hardship they would endure if adjudication is withheld from this issue does not alter the jurisdictional calculus in their favor. Thus, to the extent plaintiffs' tortious interference claim seeks recovery for the diminishment of their case against Woods, the claim is not ripe. Therefore, MMIC's motion to dismiss for lack of subject matter jurisdiction is granted without prejudice on this claim.

## C.   Failure to State a Claim

### 1.   Tortious Interference with Business Relationships or Expectancy

In South Dakota, the elements of a tortious interference with business relationships or expectancy claim are: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and improper act of interference on the part of the interferer;[10] (4) proof that the interference caused the harm sustained; and

---

[10] The state supreme court previously described the third element as

27

(5) damage to the party whose relationship or expectancy was disrupted. *Tibke v. McDougall*, 479 N.W.2d 898, 908 (S.D. 1992). With respect to these elements, and construing plaintiffs' amended complaint and reasonable inferences in their favor, the amended complaint first alleges that Bourne was acting as Nicole's treating physician and agreed to provide his services as an expert witness in plaintiffs' suit against Woods. Docket 17 at ¶¶ 16-17. Second, that MMIC knew of plaintiffs' malpractice claim against Woods, one of its insureds, and also knew that Bourne, another of its insureds, was Nicole's treating physician by virtue of the medical record disclosures it requested. *Id.* at ¶¶ 27-29. Third, that MMIC forbade Bourne to act as an expert witness in plaintiffs' malpractice lawsuit, for example, by threatening to drop Bourne from its insurance coverage if he testified on plaintiffs' behalf. *Id.* at ¶ 31. Fourth, that Bourne did, as a result of MMIC's insistence, notify plaintiffs that he would no longer be able to offer his services as an expert witness. *Id.* Finally, following Bourne's withdrawal, that plaintiffs have incurred monetary and emotional damages.[11] *Id.* at ¶¶ 50-51. MMIC argues that, accepting plaintiffs' factual allegations as true, they have not suffered compensable damages. Docket 24 at 6.

---

involving "unjustified" interference, which was recently modified to require a showing of "improper" interference. *See Gruhlke v. Sioux Empire Fed. Credit. Union, Inc.*, 756 N.W.2d 399, 408 (S.D. 2008).

[11] Plaintiffs also asserted a claim for the diminishment of their case against Dr. Woods as part of their tortious interference claim. Docket 17 at 51. Because the court has determined such a claim is not ripe for review, it will not be addressed.

It appears MMIC is attempting to use Rule 12(b)(6) to dismiss plaintiffs'
claim based on the type of damages they seek. The question before the court,
however, is whether plaintiffs have failed "to state *a claim* upon which relief can
be granted." Fed. R. Civ. P. 12(b)(6); *see also* Wright & Miller, § 1357
(explaining a motion to dismiss must be denied if "the complaint seeks *any*
legally cognizable claim for relief."). The liberal standard of notice pleading
embodied in the federal rules simply requires " 'a short and plain statement of
the claim' that will give the defendant fair notice of what the plaintiff's claim is
and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957)
(quoting Fed. R. Civ. P. 8(a)(2), *abrogated on other grounds by Twombly*, 550
U.S. at 562-63. As the Eighth Circuit recently explained, "[t]he essential
function of a complaint under the Federal Rules of Civil Procedure is to give the
opposing party 'fair notice of the nature and basis or grounds for a claim, and a
general indication of the type of litigation involved.' " *Topchian v. JPMorgan
Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (citation omitted).
Moreover, a complaint "does not need detailed factual allegations," and should
not be dismissed if a plaintiff "provide[s] the 'grounds' of his 'entitle[ment] to
relief[.]' " *Twombly*, 550 U.S. at 555 (internal citations omitted) (alteration in
original). "The well-pleaded facts alleged in the complaint, not the legal theories
of recovery or legal conclusions identified therein, must be viewed to determine
whether the pleading party provided the necessary notice and thereby stated a
claim in the manner contemplated by the federal rules." *Topchian*, 760 F.3d at
848.

Here, plaintiffs' complaint gives MMIC fair notice of their tortious interference claim as well as the grounds upon which it rests. Plaintiffs seek monetary and emotional damages if successful on their claims, and MMIC does not suggest otherwise. Because plaintiffs have provided a short and plain statement of their claim showing their entitlement to relief in accordance with Rule 8(a), dismissal pursuant to Rule 12(b)(6) is improper. MMIC's arguments, which go to the merits of plaintiffs' allegations, may more properly be considered in a motion for summary judgment. At this stage though, plaintiffs' tortious interference claim is sufficiently pleaded to survive MMIC's motion to dismiss.

### 2.    Intentional Infliction of Emotional Distress

In South Dakota, the elements of intentional infliction of emotional distress are established by showing that the defendant (1) by extreme and outrageous conduct, (2) acted intentionally or recklessly to cause the plaintiff to suffer severe emotional distress, (3) which conduct in fact caused the plaintiff severe distress, and (4) the plaintiff suffered an extreme, disabling emotional response to the defendant's conduct. *Harris v. Jefferson Partners, L.P.*, 653 N.W.2d 496, 500 (S.D. 2002). According to plaintiffs' amended complaint, and making reasonable inferences in their favor, the amended complaint states that Nicole and Bourne's physician-patient relationship arose shortly after the allegedly negligent acts involving Woods occurred. Docket 17 at ¶ 17. The amended complaint alleges that MMIC's prevention of Bourne from acting as an expert witness in plaintiffs' malpractice case amounted to extreme

and outrageous conduct given the circumstances. *Id.* at ¶ 53. Additionally, because MMIC knew of Nicole's detailed medical history and impending malpractice suit against Woods, *id.* at ¶¶ 28-29, MMIC also knew of or deliberately disregarded the high probability that Nicole would suffer emotional distress from its deterrence of Bourne. *Id.* at ¶¶ 49, 54. Further, that MMIC's prevention of Bourne from serving as an expert witness is what caused Nicole to suffer emotional distress *Id.* at ¶ 55. Finally, that Nicole's emotional distress manifested itself in the loss of her ability to place her trust in any physician. *Id.* at ¶ 50, 56.

MMIC contends that plaintiffs have not sufficiently pleaded the requisite emotional response in order to sustain their claim. Docket 24 at 14. According to MMIC, plaintiffs only offer a conclusory statement that they have "suffered an extreme, disabling emotional response to [MMIC's] conduct," which the *Twombly* Court held was insufficient to survive a motion to dismiss. *Id.* As the Supreme Court observed, providing mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. 555. Reading plaintiffs' complaint as a whole, however, Nicole alleges to have lost the ability to place her trust in any treating physician as a result of MMIC's conduct. Docket 17 at ¶ 51. It appears that this portion of the amended complaint, although appearing along with plaintiffs' tortious interference claim, is what plaintiffs' referred to with respect to the "extreme, disabling emotional response" Nicole suffered resulting from MMIC's conduct.

31

*See id.* at ¶ 56. Therefore, plaintiffs have sufficiently pleaded this element of their intentional infliction of emotional distress claim.

Next, with respect to the first element of this cause of action, South Dakota adheres to the Restatement (Second) of Torts' instruction that the determination of "whether the defendant's conduct was extreme and outrageous[] *is initially for the court.*" *Richardson v. E. River Elec. Power Co-op., Inc.*, 531 N.W.2d 23, 27 (S.D. 1995) (citing Restatement (Second) of Torts § 46 cmt. h) (1965) (emphasis in original)). The parties dispute whether, as a matter of law, MMIC's alleged deterrence of Bourne from serving as an expert witness was extreme and outrageous. *See* Docket 24 at 12, Docket 30 at 11. Similarly, the parties' other remaining disputes appear to be based on whether plaintiffs ultimately succeed on the merits of their claim. *See, e.g.*, Docket 24 at 12-13 (contending no allegation is made that MMIC directed its conduct at Nicole or that she witnessed it); Docket 30 at 12-13 (arguing plaintiffs could nonetheless prevail).

The court's inquiry on a motion to dismiss, however, is whether plaintiffs' have sufficiently pleaded a claim upon which relief can be granted, giving MMIC fair notice of the grounds upon which it rests. Accepting their factual allegations as true and construing all reasonable inferences in plaintiffs' favor, the court concludes that plaintiffs have. Whether the conduct complained of ultimately fails as a matter of law is a determination more appropriately addressed during summary judgment. Consequently, the court need not make such a decision at this stage in the proceeding. Therefore, the court holds that

plaintiffs' intentional infliction of emotional distress claim is sufficiently pleaded to withstand MMIC's motion to dismiss.

### 3.   Punitive Damages

Finally, MMIC seeks dismissal of plaintiffs' claim for punitive damages. Docket 24 at 14. "[P]unitive damages are a form of relief and not a 'claim' that is subject to a Rule 12(b)(6) motion to dismiss." *Benedetto v. Delta Air Lines, Inc.*, 917 F. Supp. 2d 976, 984 (D.S.D. 2013) (citing *Sec. Nat'l Bank of Sioux City, Iowa v. Abbot Labs.*, Civ. No 11-4017, 2012 WL 327863, at *21 (N.D. Iowa Feb. 1, 2012). Thus, because plaintiffs have claims that survive MMIC's motion to dismiss, the motion to dismiss plaintiffs' claims for punitive damages is denied.

### CONCLUSION

Plaintiffs failed to make a prima facie showing that this court has personal jurisdiction over defendants Dr. Woods and Bellevue. Additionally, to the extent plaintiffs seek recovery from MMIC for the alleged diminishment of their case against Dr. Woods, plaintiffs' tortious interference claim is not ripe for review. The remainder of plaintiffs' claims against MMIC are sufficiently pleaded to survive MMIC's motion to dismiss. Finally, because plaintiffs' request for punitive damages is a form of relief and not a claim, the motion to dismiss is denied. Accordingly, it is

ORDERED that the motion to dismiss Dr. Woods and Bellevue (Docket 26) is granted without prejudice.

33

IT IS FURTHER ORDERED that the motion to dismiss by MMIC (Docket 23) is granted in part and denied in part consistent with this court's opinion.

Dated December 17, 2014.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

34